UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **SANDRA STOKLEY**, | Case No. 1:12 CV 1603 |
| Plaintiff, | Magistrate Judge James R. Knepp II |
| v. | MEMORANDUM OPINION AND ORDER |
| **COMMISSIONER OF SOCIAL SECURITY**, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Sandra Stokley seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On March 24, 2010, Plaintiff filed an application for DIB claiming she was disabled due to borderline personality disorder, severe clinical depression, bipolar disorder, and alcoholism. (Tr.197, 226). She  alleged a disability onset date of June 6, 2006. (Tr. 197). Her claim was denied initially (Tr. 97) and on reconsideration (Tr. 105). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 112). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 23, 53). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. On June 21, 2012, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

Personal and Vocational History

Born August 28, 1965, Plaintiff was 45 years old at the time of the ALJ hearing. (Tr. 57, 59). She has a high school education and completed one year of vocational school for administrative assistant work. (Tr. 69). Prior to her alleged disability, Plaintiff worked as a bank teller, an administrative assistant, and an office manager. (Tr. 61-64, 227). Plaintiff said she was terminated from her most recent administrative assistant positions because her "personality clash[ed]" with her superiors. (Tr. 61-62). Plaintiff testified she stopped working in June 2006, when she lost custody of her children and was hospitalized for a mental breakdown. (Tr. 60). She said she could not work because of mood swings. (Tr. 69). However, Plaintiff said her medication evened out her moods and made her functional when she took it. (Tr. 77).

Plaintiff was divorced and lived with a roommate in a one-bedroom apartment. (Tr. 67-68). She reported she did not get along or interact well with others, but later testified she got along "pretty good" with her roommate, having only minor arguments related to house cleaning. (Tr. 80, 280). Concerning daily activity, Plaintiff baked, prepared meals, washed dishes, did laundry, vacuumed, and tended to personal hygiene. (Tr. 72-73). She attended Alcoholics Anonymous (AA) meetings twice a week, went to medical appointments, and traveled by public transportation because her license was suspended. (Tr. 68, 73-75). She liked to read, watch television, and cross-stitch, and she also had a cat. (Tr. 74-75).

Plaintiff had an erratic history with alcoholism, which included four arrests for driving while intoxicated and a 60-day jail sentence. (Tr. 65). At the time of the ALJ hearing, Plaintiff testified she had been sober for two years and eight months. (Tr. 65-66). However, she admitted she had relapsed for one week during this period and she could not identify her specific sobriety date. (Tr.

2

65-66). Prior to that, Plaintiff said she had been sober for nine years. (Tr. 66). Plaintiff attended AA meetings for many years, but said she had never been treated for chemical dependency in a hospital or treatment facility. (Tr. 66). She admitted she felt better when she took prescription medication and was not drinking. (Tr. 83).

Medical Evidence

***Hospitalizations***

On March 4, 2007, Plaintiff sought treatment at the Southwest General Health Center emergency room for increased depression and excessive intoxication. (Tr. 310-19). She had been drinking, was depressed, and started cutting herself on her left arm. (Tr. 310). Plaintiff was diagnosed with major depression and suicidal ideation, given anti-depressants, and referred to AA and an evening mental health program. (Tr. 310-12).

In July 2008, Plaintiff was admitted to Lakewood Hospital (Tr. 322-51) after reporting she had been drinking and began cutting her ankle with suicidal ideation (Tr. 323, 330, 336). Plaintiff reported she was not on medication for depression; instead, she self-medicated with alcohol. (Tr. 334). The doctor noted Plaintiff had no ongoing psychiatric treatment or follow-up. (Tr. 336). She was given anti-depressant medication and referred to North Coast Behavioral Health Facility (North Coast) directly following discharge. (Tr. 335).

On admission to North Coast, "[Plaintiff] did not appear depressed." (Tr. 353). Rather, speech was somewhat rapid with inappropriate laughing, but her thoughts were clear and organized. (Tr. 353). She reported she still felt suicidal but had no plans to hurt herself. (Tr. 353).  She was given anti-depressants and Ativan for alcohol withdrawal. (Tr. 353). Plaintiff complied with her medication regimen and her condition improved. (Tr. 353). Upon discharge, Plaintiff was appropriately dressed, cooperative, not depressed, not manic, not psychotic, not suicidal or

homicidal, and had adequate insight and judgment. (Tr. 353). She was diagnosed with bipolar disorder and alcohol dependence and assigned a Global Assessment of Functioning (GAF) score of 80[1]. (Tr. 354).

In August 2008, Plaintiff was taken to MetroHealth after attempting to cut her wrists. (Tr. 398). "She [said] [] it was a cry out for help and not a real [suicide] attempt." (Tr. 398). Since leaving North Coast, her medications had been cut and adjusted. (Tr. 398). "She tried to get readmitted for help with her medications but she was told she could[] [not] come back unless she had a 911 call, so she slit her wrists in [an] attempt[] to get readmitted to [North Coast]." (Tr. 398, 420). "She want[ed] help and felt this was the only way she was going to obtain it." (Tr. 398). She admitted to alcohol use that day. (Tr. 398). Dr. Jylia Lobanova interviewed Plaintiff for a mental health assessment. (Tr. 394). Plaintiff was tearful and irritable and said she felt miserable, helpless, depressed, and could not sleep. (Tr. 394). She reported she had quit drinking "many years ago", but admitted she drank wine that day. (Tr. 394-95). She was tearful and tense, but her thoughts were logical and organized. (Tr. 395). Later that day, Plaintiff was reassessed, denied suicidal ideation, and stated she had no intention of hurting herself. (Tr. 395). She was diagnosed with bipolar disorder, not otherwise specified and discharged. (Tr. 395).

On September 30, 2008, Plaintiff was taken to the emergency room at Fairview Hospital after cutting her wrists. (Tr. 356-57). Testing revealed elevated alcohol levels, and she admitted to alcohol

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 71–80 reflects slight to no symptoms, and if present they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after a family argument) and no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in school work). *Id.* at 34.

4

use. (Tr. 357). Plaintiff's lacerations were not actively bleeding, there was no tendon involvement, and she had good range of motion. (Tr. 357). Her wounds were repaired, her alcohol level reduced, and she was diagnosed with severe depression and alcohol abuse. (Tr. 357). Plaintiff was referred and transferred to North Coast. (Tr. 372-375).

Upon admission to North Coast, Plaintiff reported she had been at home, felt depressed, began to drink, said "screw it", and "slashed her ankles and wrists with a razor." (Tr. 382). Plaintiff stated, "I drank and shouldn't drink." (Tr. 382). North Coast examiners noted "she wished she was dead but [] she also wants to get out of the house, find a place[,] and find a new job." (Tr. 382). She denied manic or psychotic symptoms and acknowledged that she needed to utilize North Coast's services this time. (Tr. 382). She was diagnosed with mood disorder and alcohol dependence and assigned a GAF of 45[2]. (Tr. 382).

During her stay at North Coast, Plaintiff reported she had tried to commit suicide four times, and "all four times she was intoxicated with alcohol." (Tr. 383). She also reported when she was sober between 1993 and 2001, she had been taking Zoloft and other anti-depressant medications. (Tr. 383). Plaintiff reported she lost two jobs due to her alcohol use. (Tr. 383). Treatment notes stated Plaintiff "remained calm and cooperative at all times during her stay, and there were no signs and symptoms of a major mental illness". (Tr. 384). She was referred to rehabilitation for alcohol dependence and secured a bed at Ocra House on November 3, 2008. (Tr. 384). Upon discharge, Plaintiff had no suicidal ideation, her thought process was goal-directed and logical, she was cheerful and euthymic, and she had good insight and judgment. (Tr. 384). S. Erfan Ahmed, M.D.,

---

2. A GAF score of 45 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR*, at 34.

5

opined that Plaintiff's "primary problem" was her alcohol dependence, further noting her prognosis would not improve unless she abstained from alcohol and sought treatment. (Tr. 384).

On February 21, 2009, Plaintiff sought treatment at the MetroHealth emergency room for suicidal ideation after a fight with her boyfriend. (Tr. 386). Plaintiff was intoxicated upon arrival and admitted to alcohol use. (Tr. 386-87). Plaintiff was stabilized and reevaluated after she was sober. (Tr. 387). Upon examination, Plaintiff said she was feeling better, no longer felt suicidal, and claimed it "was just due to [alcohol]". (Tr. 387). She requested to go home and was discharged in stable condition. (Tr. 387).

### Dr. Trzeciak

Victor J. Trzeciak treated Plaintiff for depression in November 2005 and July 2006. (Tr. 305). In November 2005, Plaintiff was in the hospital two days after a two-week drinking binge brought on by a job loss and the end of a long term relationship. (Tr. 305-06). She was given Lexapro, after which she felt much better and "was no longer down or depressed like she was." (Tr. 305). Dr. Trzeciak discussed the importance of drinking cessation because of her predisposition to alcoholism and inheritance of the same. (Tr. 305). Plaintiff said she was attending AA meetings and had good family support. (Tr. 305).

In July 2006, Plaintiff followed up with Dr. Trzeciak for depression after she was terminated from another job and began to binge drink. (Tr. 305). She reported suffering from severe anxiety, nervousness, and stress, but had no suicidal ideation. (Tr. 305). She admitted she had stopped taking Lexapro. (Tr. 305). Dr. Trzeciak recommended Plaintiff stay away from alcohol and take her anti-depressant medication. (Tr. 305).

In November 2009 and April 2010, Dr. Trzeciak treated Plaintiff for headache pain and sinusitus, respectively. On both occasions, Dr. Trzeciak noted Plaintiff's mood and affect were

appropriate and she was oriented in all spheres. (Tr. 530, 590). In April 2010, he further noted Plaintiff was well-appearing, well-developed, and in no acute distress. (Tr. 590). Plaintiff returned to Dr. Trzeciak in December 2010, and stated she was nonfunctional and unable to deal with stress or other people due to her bipolar disorder. (Tr. 592). Again, Plaintiff was well-appearing, well-developed, in no acute distress, and her mood and affect were appropriate. (Tr. 592). He noted her history of chronic alcoholism and bipolar depression. (Tr. 592).

In December 2010, Dr. Trzeciak filled out a mental capacity questionnaire and found Plaintiff had a good ability to follow work rules, maintain appearance, follow, remember, and carry out simple job instructions, and a fair ability to use judgment, maintain regular attendance, function independently without supervision, follow, remember, and carry out detailed, but not complex job instructions, and behave in an emotionally stable manner. (Tr. 571-72). He also found Plaintiff had a poor ability to socialize, understand complex job instructions, complete a normal workday and work week, deal with work stressors, work with others, deal with the public, and interact with supervisors. (Tr. 571-72). Fair was defined as "moderately limited but not precluded", and poor meant "significantly limited." (Tr. 571). When asked to provide clinical findings to support the assessment, Dr. Trzeciak stated that Plaintiff suffered from chronic alcoholism and bipolar depression. (Tr. 572).

### Dr. Lambert

On April 23, 2009, Plaintiff's treating psychiatrist Dr. Laura Lambert completed a mental status questionnaire. (Tr. 430-36). At that time, Plaintiff reported she had been sober since September 2008 and attended AA meetings. (Tr.432, 435). Dr. Lambert found Plaintiff related well to staff, was cooperative, goal-directed, and coherent, and her dress and grooming were appropriate.

(Tr. 430). She was not depressed, denied crying spells or problems sleeping, had an adequate memory, and had fair insight and judgement. (Tr. 431-33). She had above average intelligence, with good abilities to calculate, interpret proverbs, and think abstractly. (Tr. 434). She was alert and oriented and had an adequate memory. (Tr. 434-35). Dr. Lambert found Plaintiff mildly impaired in her abilities to understand and follow instructions and relate to others due to her mood instability, not impaired in her ability to maintain attention and follow simple tasks, and moderately impaired in her ability to withstand stress and pressures associated with day-to-day work activity. (Tr. 436). Dr. Lambert diagnosed Plaintiff with bipolar disorder and alcohol dependence in early remission and assigned her a GAF of 65[3]. (Tr. 436).

On November 2, 2009, David Brager, C.P.N. and Dr. Lambert filled out a mental status questionnaire. (Tr. 495-97). They found Plaintiff's appearance was neat and clean but her speech was rapid and her mood labile. (Tr. 495). She demonstrated agitation, irritability, argumentative behavior, yelling, and physical altercations. (Tr. 495). She had no hallucinations, was oriented in all spheres, and had average intelligence but impaired concentration. (Tr. 495). Although sober for one month, it was noted Plaintiff self-medicated her bipolar disorder with alcohol and drugs. (Tr. 495). They found Plaintiff had a fair ability to remember, understand, and follow directions, and impaired abilities to maintain attention and concentration. (Tr. 495). They concluded Plaintiff would have difficulty working in close proximity to others due to mood lability and distractibility. (Tr. 496).

On November 15, 2010, Dr. Lambert completed a mental capacity form and found Plaintiff

---

3. A GAF score of 65 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *DSM-IV-TR*, at 34.

had a good ability to function independently without supervision and a fair ability to follow work rules, use judgment, maintain regular attendance, work in close proximity to others, complete a normal workday or work week without interruption, understand, remember, and carry out complex job instructions, maintain appearance, socialize, relate, and behave in an emotionally stable manner. (Tr. 570). Fair was defined as "moderately limited but not precluded." (Tr. 569-70). She also found Plaintiff had a poor ability to understand, remember, and carry out detailed, but not complex job instructions, deal with work stress, maintain regular concentration for extended periods of two hour segments, and respond appropriately to changes in the work setting. (Tr. 569-70).

### Consultive Examination

On June 26, 2009, psychologist Mitch Wax, M.D., examined Plaintiff and evaluated her mental condition. (Tr. 439-47). Plaintiff told Dr. Wax she lived in a friend's basement and received ten dollars per week from her mother and ten dollars per week from her neighbor for doing their laundry. (Tr. 439). She said she graduated high school and completed one year of college, taking secretarial courses. (Tr. 439). Plaintiff said bipolar and personality disorders prevented her from working. (Tr. 439). She told Dr. Wax she had been sober for a year and was taking her medication. (Tr. 440). Plaintiff said she last worked in 2006 but was fired because she and her boss did not get along. (Tr. 440). However, she added "she ha[d] been fired from all of her previous jobs due to drinking or missing work." (Tr. 440). She reported she was autonomous – "I can take care of myself" – and compulsive, and had to clean her home frequently. (Tr. 441). Plaintiff was divorced and had two children, aged fourteen and twelve, but had no contact with them. (Tr. 443-44).

On examination, Plaintiff was clean, neat, and attractive. (Tr. 440). Initially she related well to Dr. Wax, but her ability to relate became poor as the session progressed. (Tr. 440). "She deteriorated as the session progressed, becoming tired and responding slowly to questions." (Tr.

440). Although Plaintiff's ability to concentrate was intermittent, she "surprisingly had excellent memory for past, recent[,] and current events." (Tr. 442). Dr. Wax found Plaintiff had average intelligence but said she was difficult to interview, and "[b]y the end of the evaluation, she appeared to be sucking the energy out of the room." (Tr. 444). He believed she would have difficulty working around most people. (Tr. 444).

Concerning daily activity, Plaintiff reported she cooked and did dishes daily, and vacuumed, cleaned the bathroom, and did laundry every two weeks. (Tr. 443). She also cross-stitched daily, read about three books per week, and watched three-to-four hours of television a day. (Tr. 443). After dinner, she usually watched television and played with her cat. (Tr. 443). She spoke to her mother five times a week, talked to a friend on the phone once a week, and attended AA meetings two-to-three times per week. (Tr. 443).

Dr. Wax opined Plaintiff's mental ability to understand, remember, and follow instructions was not impaired. (Tr. 445). She was "assessed [as] being mentally capable of understanding, remembering[,] and following instructions to work on a job." (Tr. 445). He found her ability to maintain attention, concentration, and persistence moderately impaired, and her ability to withstand the stresses and pressures of day to day work activity markedly impaired. (Tr. 445). Dr. Wax believed she had a good ability to perform some simple, repetitive tasks, but had difficulty maintaining a job and getting along with others. (Tr. 445).

### *State Agency Reviewing Psychologists*

In July 2009, Dr. Karen Steiger reviewed Plaintiff's medical records and assessed her mental capacity. (Tr. 448-65). Dr. Steiger found Plaintiff had bipolar syndrome, personality disorder with borderline features, and alcohol abuse in early remission. (Tr. 451, 455-56). She found Plaintiff was

10

mildly restricted in activities of daily living, had moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. (Tr. 458). Generally, Dr. Steiger found Plaintiff was not significantly limited in the categories of understanding and memory, sustained concentration and persistence, social interaction, or adaptation. However, she was moderately limited in her abilities to understand, remember, and carry out detailed instructions, maintain concentration for an extended period of time, work with others without being distracted, get along with others, accept criticism, and complete a normal workday or work week without interruption. (Tr. 462-63).  Dr. Steiger summarized Plaintiff's medical records up to that point and specifically determined Plaintiff retained the ability to remember and follow simple tasks at a job where strict time and production pressures were not imposed and limited to only superficial contact with others. (Tr. 464-65). On November 20, 2009, Marianne Collins, Ph.D., reviewed Plaintiff's updated medical records and affirmed Dr. Steiger's conclusion. (Tr. 537).

***Other Medical Sources***

Plaintiff saw David Brager, C.N.P, as well as another nurse practitioner, at Center for Families and Children on numerous occasions for medication management. (Tr. 498-521, 538-47). Treatment notes stated Plaintiff was admitted to a crisis shelter due to suicidal ideation in August 2008. (Tr. 520). However, Plaintiff said "she lied and was not really suicidal." (Tr. 520). In September 2008, Plaintiff reported she was sober but living with a boyfriend who abused alcohol. (Tr. 518). She denied depression and was alert, oriented, and goal-directed. (Tr. 514, 515, 516, 518). Plaintiff then missed a series of appointments until she presented in December 2008. (Tr. 513). She reported she had relapsed on alcohol, went to North Coast, and was discharged to Ocra House but left because the place "was full of crackheads." (Tr. 513). She then smiled, and said she was "going to AA meetings in a bar." (Tr. 513). Treatment notes indicated Plaintiff did not have a sponsor and

11

was not actively working towards sobriety. (Tr. 513).  By January 2009, Plaintiff reported she had not been drinking and was doing well on Abilify. (Tr. 510). In April 2009, Plaintiff had a bright affect, was doing good, and denied depression and suicidal ideation. (Tr. 507-08). She reported she went to AA four-to-five times per week. (Tr. 507). In May 2009, Plaintiff reported she was doing well but had some mood swings. (Tr. 505). In August 2009, Plaintiff denied mood swings and suicidal thoughts, was doing well on her medication, attended three AA meetings a week, and was in a bright mood. (Tr. 501). Plaintiff complained of racing thoughts on one occasion (Tr. 539), but generally her visits in 2009 were unremarkable. She did indicate she was depressed or under stress on numerous occasions due to an impending court date for not paying child support. (Tr. 502, 503, 504, 540, 544, 545). However, she admitted she was stable on her current medications despite being stressed. (Tr. 541).

On January 27, 2010, Nurse Brager filled out a medical source statement  assessing Plaintiff's mental capacity. (Tr. 551-52). He indicated Plaintiff had a poor or fair ability to function in several areas of mental functioning, but had a good ability to maintain regular attendance, function independently without supervision, and understand, remember, and carry out simple and detailed job instructions. (Tr. 551-52). That same month, Nurse Brager's progress notes indicated Plaintiff was stable, doing well with her medication regimen, and managing her life better. (Tr. 553). Throughout 2010, Plaintiff was sober and remained stable on her medication regimen. (586, 587, 588, 595, 596, 597).

ALJ's Decision

On March 23, 2011, the ALJ found Plaintiff had the severe impairments of major depressive, bipolar, borderline personality, and anxiety disorders, as well as nicotine dependence, alcoholism, and obesity. (Tr. 29). She found these impairments, including the substance use disorder, met listing

impairments 12.04 and 12.09. 20 C.F.R. Part 404, Subpt P, App. 1. (Tr. 29). However, the ALJ concluded if Plaintiff stopped the substance use, she would not have an impairment that met or medically equaled a listed impairment. (Tr. 31-47).

The ALJ discussed the record evidence and concluded, if she stopped substance use, Plaintiff had the residual functional capacity to perform light work, except she was limited to a supervised, low stress environment requiring few decisions and only occasional interaction with the public, co-corkers, and supervisors. (Tr. 36). Her RFC also provided that Plaintiff maintained a moderate ability to keep concentration, pace, and persistence, meaning that she would not perform at the high end or the low end of the spectrum. (Tr. 36). Based on VE testimony, the ALJ found Plaintiff could perform a significant number of jobs in the national and local economies. (Tr. 46-47).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

13

### STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

14

**DISCUSSION**

Plaintiff argues the ALJ erred by finding substance abuse was a material factor contributing to her disability determination. (Doc. 15, at 10-14). Plaintiff also argues the ALJ failed to provide good reasons for discounting treating physician Dr. Lambert's November 2, 2009,  and November 10, 2010, evaluations. (Doc. 15, at 14-19).

Substance Use

 In 1996, Congress amended the Social Security Act to prohibit the award of benefits when alcoholism or drug addiction is a contributing factor material to an individual's disability determination. 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J); *see also Mathews v. Astrue*, 2011 WL 7145221, *7 (N.D. Ohio 2011). The key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether the individual would be disabled if he or she stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1); *see Mathews*, 2011 WL 7145221 at *7.

In order to determine whether an individual is precluded from benefits, an ALJ must first determine if an individual is disabled, irrespective of substance use.  *Id.* § 404.1535(a). Next, the ALJ must determine whether alcohol or drug abuse is a material contributor to the disability. *Mathews*, 2011 WL 7145221 at *7.  If the ALJ determines the remaining limitations would not be disabling without substance use, then drug addiction or alcoholism is a "contributing factor material to the determination of disability" and benefits shall not be awarded. *Id.* § 404.1535(b)(2)(i).

First, Plaintiff argues her substance was periodic rather than chronic and ongoing, and therefore should not have been considered a contributing factor material to the determination of a disability. (Doc. 15, at 12). However, the distinction between "sobriety with periods of relapse" and "non-sobriety" is truly one without a difference. Instead, the Court must focus on Plaintiff's mental

15

condition when she was abusing alcohol compared to when she was not. Plaintiff secondarily argues the evidence demonstrated her condition was disabling in the absence of alcohol. (Doc. 15, at 12). However, when Plaintiff complied with her medication and did not abuse alcohol, it is apparent her mental condition was stable, and she admittedly felt better.

The ALJ concluded Plaintiff was not disabled when her substance use was taken into account because her alcohol use prompted her suicide attempts. (*See* Tr. 29-30, *referring to* Tr. 310-19, 323, 330, 336, 398, 420, 357, 382, 383, 386-87). Indeed, during her November 2008 stay at North Coast, Plaintiff said she tried to commit suicide four times, and "all four times she was intoxicated with alcohol." (Tr. 383). In August 2008, Plaintiff went to the emergency room intoxicated after attempting to cut her wrists. (Tr. 398). Once she was sober, she denied suicidal ideation and said she had no intention of killing herself. (Tr. 395, 398). Again, after she was stabilized during one alcohol related suicide attempt, Plaintiff admitted the attempt "was just due to [alcohol]", said she was no longer suicidal, and requested to go home. (Tr. 387).

In addition, both times she was discharged from North Coast, Plaintiff was sober, medication compliant, and not suicidal or manic. (Tr. 353, 384). Instead, she was goal-directed, cheerful, and euthymic. (Tr. 353, 384). North Coast physician Dr. Ahmed specifically found Plaintiff's "primary problem" was alcohol dependance, and said she would not improve unless she abstained from alcohol. (Tr. 384). Further, when Plaintiff was in early remission from alcohol dependance, Dr. Lambert's evaluation indicated Plaintiff was not depressed and she had no trouble sleeping. (Tr. 431-32). Moreover, Nurse Brager's treatment notes reflected Plaintiff denied suicidal ideation and depression when she was sober and medication compliant. (Tr. 501, 505, 507-08, 510). Although Plaintiff experienced increased stress because of an impending court date (Tr. 502, 503, 504, 540, 544, 545), she admitted her medications stabilized her mood. (Tr. 541). Plaintiff points to two

16

treatment sessions with Nurse Brager in 2010 which indicated Plaintiff had increased depression (Tr. 554, 561); however, the majority of Nurse Brager's treatment notes from 2010 showed Plaintiff was stable on her medication regimen and sober. (Tr. 586, 587, 588, 595, 596, 597). Plaintiff also admitted at the ALJ hearing that she felt better when she abstained from alcohol and was on medication. (Tr. 83).

The ALJ also found Plaintiff markedly impaired in her ability to perform activities of daily living when she was drinking, but only mildly or moderately impaired when she was sober. (Tr. 30-31, 43). She specifically noted, "when drinking, [Plaintiff] apparently was not functioning at all." (Tr. 30). As support, she referenced Plaintiff's alcohol induced suicide attempts, alcohol related job terminations, and that she lost custody of her children. (Tr. 30). She also relied on Plaintiff's hearing testimony that she performed a normal range of activities when she was sober, such as household chores, self-care, and hobbies. (Tr. 72-75). Indeed, when Plaintiff was sober, she cooked, did dishes, cross-stitched, and watched three-to-four hours of television daily. (Tr. 443). She was also an avid reader, reading about three novels per week. (Tr. 443). She attended AA two-to-three times per week (Tr. 80, 443), spoke with her mother five times a week (Tr. 443), and got along "pretty good" with her roommate (Tr. 80). `

Plaintiff directs the Court to Dr. Wax's mental capacity evaluation to support the notion that she was disabled in the absence of substance use because she deteriorated during the evaluation. (Doc. 15, at 13, *referring to* Tr. 439-40). However, despite Plaintiff's deterioration, Dr. Wax found Plaintiff had an excellent memory and average intelligence. (Tr. 442). Moreover, he found Plaintiff was "mentally capable of understanding, remembering[,] and following instructions to work on a job." (Tr. 445). And she "had a good ability to perform some simple, repetitive tasks" despite her "difficulty maintaining a job and getting along with others." (Tr. 445).

17

The ALJ properly outlined the standard of review for a claimant with alcoholism, and analyzed Plaintiff's claim against that backdrop. (Tr. 29-36). The ALJ found Plaintiff had severe impairments; however, after considering Plaintiff's substance use in the analysis, the impairments, or combination thereof, did not meet or equal a listing impairment. Moreover, continuing the five-step analysis, the ALJ determined that if Plaintiff stopped using alcohol, her residual functional capacity would enable her to make a successful adjustment to work that exists in significant numbers in the national economy.  As set forth above, substantial evidence supports the ALJ's conclusion.

Treating Physician Rule

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a  treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship –  length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4)

18

consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ"s reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

With Nurse Brager's aid, Dr. Lambert performed mental capacity evaluations on April 23, 2009 (Tr. 431-33), November 2, 2009 (Tr. 495-97), and November 15, 2010 (Tr. 569-70), and the ALJ discussed each one (Tr. 40-43). Plaintiff takes issue with the ALJ's treatment of Nurse Brager and Dr. Lambert's November 2, 2009 and November 10, 2010 evaluations. (Doc. 15, at 14-19). Specifically, she asserts the ALJ's reasons were  insufficient and not supported by substantial evidence. Not so.

First, the ALJ provided good reasons to discount the November 2, 2009 evaluation because she touched upon several factors an ALJ is required to consider in §§ 404.1527(d) – treatment

relationship, supportability, and consistency. The ALJ summarized Dr. Lambert's November 2, 2009 evaluation[4] but found it "vague in nature" and assigned it little weight. (Tr. 41-42). She noted "fair" was an imprecise term that did not by definition preclude work. (Tr. 41). Indeed, unlike "check the box forms" where the definition of fair is provided, the November 2, 2009 evaluation form did not provide a precise definition for "fair." (Tr. Tr. 495-97). Instead, the physician was asked to describe Plaintiff's mental status and provide brief examples to support her clinical conclusions. (Tr. 495). In this case, Dr. Lambert did not provide an explanation as to what she meant when she scribed "fair", nor did she provide clinical observations to support her conclusion. This denotes lack of supportability.

The ALJ also concluded the November 2, 2009 evaluation was inconsistent with Nurse Brager's own treatment notes. (Tr. 42). Indeed, Nurse Brager's treatment notes from January 2009 through November 2009 generally showed Plaintiff denied depression (Tr. 507, 510), was not suicidal (Tr. 501, 507, 508, 510, 542), denied mood swings (Tr. 501, 542), had more energy (Tr. 510), was friendly or bright (Tr. 501, 507, 542), and was doing well on medication (Tr. 501, 539, 542). On one occasion, Plaintiff reported mood swings, but at the same time stated she was "doing well". (Tr. 505). Plaintiff also reported her mood was stable despite the stress of an upcoming court case. (Tr. 541).

Notably, as the ALJ pointed out, the November 2, 2009 opinion did not "on its face" contradict the ALJ's holding. (Tr. 42). Indeed, Nurse Brager and Dr. Lambert concluded Plaintiff had a fair ability to remember, understand, and follow directions, and impaired abilities to maintain attention and concentration. (Tr. 495). The ALJ accounted for this when she determined Plaintiff

---

4. The ALJ incorrectly referenced the date of this opinion as October 2009 but cited to the correct portion of the record when analyzing the opinion. (Tr. 41).

was limited to a supervised, low stress environment requiring few decisions, and had a moderate ability to maintain concentration, pace, and persistence. (Tr. 36). Moreover, Nurse Brager and Dr. Lambert concluded Plaintiff would have difficulty working in close proximity to others (Tr. 496), which the ALJ accounted for by limiting Plaintiff to only occasional interaction with the public, co-corkers, and supervisors (Tr. 36).

The ALJ also provided good reasons for discounting Nurse Brager and Dr. Lambert's November 15, 2010 assessment. (Tr. 42). Plaintiff argues the ALJ erred when she determined this assessment was "entirely contradictory to [internal] treatment records and the record as a whole." (Doc. 15, at 17, *quoting* Tr. 42). Once again, while Plaintiff points to occasional references of increased depression, these instances were generally related to an impending court date or applying for social security benefits (Tr. 498, 540), save one (Tr. 561). While she did experience some anxiety and "mild depression" due to her social security outcome, these symptoms were noted as "low grade depressive symptoms" (Tr. 589, 595) or "financial stressors" (Tr. 586, 595, 596, 597). The majority of Nurse Brager's treatment notes from 2010 showed Plaintiff was stable on her medication regimen, sober, and goal-directed. (Tr. 586, 587, 588, 595, 596, 597). Suitably, the ALJ found these notes inconsistent with the portion of the evaluation that concluded Plaintiff had a poor ability to concentrate, handle stress, and deal with routine change. (Tr. 42, *referring to* 569-70).

Plaintiff also takes issue with the ALJ's "selective use" of Dr. Lambert's April 23, 2009 opinion, which indicated Plaintiff was not depressed and had only mild limitations. (Tr. 431-33). Plaintiff essentially complains that the ALJ cherry picked this opinion to discount other evidence. Notably, Plaintiff does not argue the substance of the opinion, just its use. However, the use of an opinion by a treating source to discredit non-treating source opinions is assuredly not an error. Plaintiff attempts to argue the later opinions were more accurate because Dr. Lambert had treated

21

her longer. However, as noted above, the ALJ discredited portions of Dr. Lambert's later opinions because they were inconsistent with her own treatment records and the record as a whole. Therefore, the ALJ's treatment of these later opinions is consistent with her use of the April 23, 2009 evaluation.

Plaintiff also contends Dr. Wax's and Dr. Trzeciak's opinions supported Dr. Lambert's later opinions. However, this is not so. Dr. Wax concluded Plaintiff would have difficulty working around most people, which the ALJ accounted for in her decision by limiting Plaintiff to occasional interaction with the public, her supervisor, and co-workers. (Tr. 36, 444). Dr. Wax also found Plaintiff had a moderate ability to maintain concentration, persistence, and pace, which the ALJ specifically accounted for in her RFC. (Tr. 36, 444). In addition, he explicitly found Plaintiff had a good ability to perform simple, repetitive tasks and was "mentally capable of understanding, remembering[,] and following instructions to work on a job". (Tr. 445).

Plaintiff argues a portion of Dr. Trzeciak's opinion supported Dr. Lambert's later evaluations – specifically, his opinion that Plaintiff had a poor ability to maintain attention and concentration for more than two hour segments, interact with supervisors, and deal with work stress. (Doc. 15, at 19). However, the ALJ discounted this opinion because there was no mention of exacerbated psychological symptoms in Dr. Trzeciak's own treatment notes. (Tr. 34). As Plaintiff points out, Dr. Trzeciak treated her mainly for physical ailments. (Doc. 15, at 19). And other than Plaintiff's self reports of bipolar symptoms (Tr. 592), Dr. Trzeciak's treatment notes reflected Plaintiff was well-appearing, well-developed, in no distress, and her mood and affect were appropriate. (Tr. 530, 590, 592). Overall, the ALJ properly evaluated Dr. Lambert's evaluations, and substantial evidence supports her findings.

22

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

        s/James R. Knepp, II        
United States Magistrate Judge
